IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

CLARA RAQUEL EPSTEIN, M.D.
Plaintiff

v.

THE OHIO STATE UNIVERSITY,
OHIO STATE BOARD OF TRUSTEES,
OHIO STATE UNIVERSITY MEDICAL CENTER,
OHIO STATE UNIVERSITY MEDICAL CENTER SERVICES BOARD,
OHIO STATE COLLEGE OF MEDICINE,
CAROLE MILLER, M.D., Individually,
ANDREW THOMAS, M.D., Individually,
JOHN OGDEN, M.D., Individually,

Defendants.

_____

**COMPLAINT**
_____

COMES NOW Plaintiff, Clara Raquel Epstein, M.D. ("Dr. Epstein"), by and through her attorneys, Cameron W. Tyler and Associates, P.C., and alleges and complains against Defendants as follows:

**PARTIES**

1. Plaintiff has been a resident of the State of Colorado since 2008.

2. Defendant Ohio State University is an institution of higher education organized under the laws of the State of Ohio located in the State of Ohio and operated through the Ohio State University Board of Trustees and under which the Ohio State University Medical Center, operated by the Ohio State University Medical Center Service Board, and the Ohio State University College of Medicine, are organized and operate, all of which are persons subject to suit pursuant to 42 U.S.C. §2000 and §1983 (hereinafter collectively referred to as "OSU").

3. At the time of the events giving rise to this action, Defendant Miller was a resident of the State of Ohio.

4. At the time of the events giving rise to this action, Defendant Thomas was a resident of the State of Ohio.

5. At the time of the events giving rise to this action, Defendant Ogden was a resident of the State of Ohio.

## JURISDICTION

6. Jurisdiction is asserted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5.

7. Defendants OSU are employers within the meaning of 42 U.S.C. §2000e et seq.

8  The alleged unlawful employment practices and discriminatory conduct took place at the following locations:

   The Ohio State University College of Medicine, Columbus, Ohio;
   The Ohio State University Medical Center, Columbus, Ohio;
   The Ohio State Hospital
   Riverside Methodist Hospital, Columbus, Ohio;
   Children's Hospital aka Nationwide Children's Hospital, Columbus, Ohio

9. Jurisdiction is asserted against the individual Defendants pursuant to 28 U.S.C. 1331, 1332, 1343, and 1367, including pendant jurisdiction pursuant to statutory authority.

## ADMINISTRATIVE PROCEDURES

11. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, Complaint # 532-2008-0554, or other appropriate administrative agency on January 29, 2008, regarding the alleged discriminatory conduct by Defendant(s).

12. Plaintiff filed a second charge of retaliation with the Equal Employment Opportunity Commission, Complaint #532-2009-02295, or other appropriate administrative agency on July 31, 2009.

13. Plaintiff received from the Equal Employment Opportunity Commission or other appropriate administrative agency Notices of Right to Sue the Defendant(s) dated March 11, 2010.

## NATURE OF THE CASE

14. Defendants have discriminated against Plaintiff based upon her Age, Gender, Religion, and National Origin by failure to promote, demotion in rank, unequal pay and work conditions, and discharge from employment.

15. The individual Defendants have discriminated against Plaintiff by sexual harassment and slander, and which actions constitute outrageous conduct and negligent infliction of emotional distress.

16. Defendants have also acted in retaliation against Plaintiff following complaints by Plaintiff of the above cited discriminatory conduct.

## GENERAL FACTUAL ALLEGATIONS

1. Clara Epstein is a forty-six year-old Hispanic, Jewish female, who received her medical degree in 1996 from The Chicago Medical School. She has obtained her residency training and is Board Certified in Neurological Surgery and has completed two postgraduate sub-specialty fellowships in Neurological Surgery.

2. On May 7, 2003, after having interviewed with Dongwoo John Chang, MD, ("Dr. Chang"), Acting Chairman of the Division of Neurosurgery, and several faculty members, Dr. Epstein was offered employment through the neurosurgical program of the Ohio State University College of Medicine as a physician at the Ohio State University Medical Center ("OSU Medical Center") as a Post-Graduate Year 4 ("PGY-4") resident, Dr. Epstein accepted the offer and terminated her position at Wayne State University where she was completing a fellowship in Stereotactic Neurosurgery.

3. On May 28, 2003, Dr. Epstein was informed by Dr. Carole Miller ("Dr. Miller"), who had just assumed her position as Neurosurgery Residency Program Director at OSU Medical Center, that there was not a position in the program for Dr. Epstein and that Dr. Epstein would not be a resident at OSU Medical Center. Dr. Miller is a white, Christian, female who, at the time, was in her late sixties.

4. Only after Dr. Epstein obtained legal counsel and secured the assistance of Michael Flesher, a resident advocate of the American Medical Association, was the offer to Dr. Epstein of employment at OSU Medical Center reinstated on June 1, 2003.

5. On or about June 2, 2003, Dr. Chang informed Dr. Epstein that, contrary to his earlier representations, she would start at OSU Medical Center at a PGY-3 position, rather than a PGY-4 position. Dr. Chang informed Dr. Epstein that Dr. Miller had made the decision not to start her at a PGY-4.

6. Dr. Epstein was thereafter not allowed to start her position until August 1, 2003, one-

      month after the academic year had begun. In addition, Dr. Miller attempted to modify the terms of Dr. Epstein's employment contract to require that she pass the American Board of Neurological Surgeons examination in a shorter time period than that required of male neurosurgical residents and the time period set forth in the OSU College of Medicine Neurosurgical Residency Training Bylaws.

7. On October 15, 2003, despite positive references from Dr. Chang and without having had adequate time or opportunity to appropriately evaluate Dr. Epstein, Dr. Miller wrote to Lisa Hunt of the Credentials Committee that Dr. Epstein had "gaps in her fund for knowledge."

8. At or about the same time, Dr. Epstein was advised by Dr. John Ogden ("Dr. Ogden") a white, male OSU Medical Center neurology resident in his thirties with less experience than Dr. Epstein, that as Chief Resident at Children's Hospital (one of three hospitals where residents of OSU College of Medicine train) he was going to preclude her from operating and that she would have to take a subservient "junior role" while rotating at Children's. Subsequently, without providing a reason nor basis for his statements, Dr. Epstein was not allowed by Dr. Ogden to participate in the majority of surgical cases at Children's Hospital.

9. Dr. Epstein advised Dr. Miller of Dr. Ogden's conduct, however Dr. Miller refused to take any corrective action and told Dr. Epstein to "be a good junior resident," and that it was "not important at that time to be allowed to participate in operative cases."

10. Despite her previous representations that Dr. Epstein's participation in operative cases was not important, on February 26, 2004, Dr. Miller documented in Dr. Epstein's file "Concerns Clinically. Rarely seen in OR @ Children's." and "Get as much time as possible in the OR", even though she had previously condoned Dr. Ogden's preclusion of Dr. Epstein from surgical procedures.

11. During this period of time, other white, male, younger residents of OSU Medical Center were all allowed more OR time and greater surgical training (in most cases double) than Dr. Epstein.

12. In addition to precluding Dr. Epstein from appropriate and adequate surgical training, Dr. Ogden frequently made offensive and inappropriate sexual comments either directly to or in the presence of Dr. Epstein about other women, his prior sexual encounters, and his frequenting of strip bars. Although Dr. Epstein requested that he refrain from such comments, Dr. Ogden stated that she talked too much and needed to learn her place and that he didn't need her to be his mother.

13. Despite her request that he not do so, Dr. Ogden continued to speak to Dr. Epstein about

       his personal relationships and yelled at her on numerous occasions in front of both staff and patients. Dr. Epstein reported the incidents to her Chief Resident, Leslie Ackapo-Satchivi, MD as well as, to Scott Elton, MD, a faculty pediatric neurosurgeon who was assigned as her "mentor" while at Children's Hospital, and to Dr. Miller, however Dr. Ogden's inappropriate behavior continued the entire time that he worked with Dr. Epstein at Children's Hospital.

14. In addition to her conduct directed toward Dr. Epstein, Dr. Miller stated to Kelly Ishizuka (a medical student whom Dr. Epstein was mentoring), that women have no place in neurosurgery, that she could not be married or have a family and be a neurosurgeon, and encouraged Ms. Ishuzuka to choose a different career path.

15. On February 26, 2004, Dr. Epstein received her 6-month review in which Dr. Miller documented her lack of time in the operating room as a weakness and that Dr. Epstein would be placed on probation if she did not pass the upcoming ABNS exam and further required that Dr. Epstein return to on-service status as of April 1, 2004, thereby effectively terminating Dr. Epstein's ability to study for the upcoming ABNS exam.

16. The male OSU neurosurgical residents have never been required to pass an ABNS exam prior to their chief year of residency training (typically PGY-6) and under the threat of being placed on probation nor been required to take the exam without having a full year of off-service status within which to study.

17. Dr. Miller failed to include in Dr. Epstein's 6-month review a rating from Dr. Gregory Christoforidis ("Dr. Christoforidis") with whom Dr. Epstein had spent three months on an interventional Neuroradiology/clinical research rotation as well as working on a research project for which she subsequently won the OSU Annual Research poster award, which had never been awarded to a Neurosurgical resident and which she subsequently presented at three international conferences.

18. Similarly, Dr. Miller failed to include in Dr. Epstein's 6-month review the rating of Dr. Chang, with whom Dr. Epstein primarily worked and which rated her performance as very high.

19. Dr. Miller did, however, include in her review an allegation based on statements made by Dr. Elton that Dr. Epstein failed to promptly respond when she was paged, even though Cindy S. Jahn, ED, the Unit Coordinator supervising the nursing staff, stated in a letter dated March 2, 2004, that Dr. Epstein consistently responded to pages very quickly. Dr. Elton subsequently retracted his statements.

20. On February 26, 2004, Dr. Miller falsely stated in front of faculty and staff members that personnel at Mt. Sinai Medical Center had told her that Dr. Epstein had been fired from her previous neurosurgical training program and that personnel at Wayne State

University had advised her that Dr. Epstein did not have enough training or experience while failing to disclose the prior submission to OSU of a letter of recommendation from Dr. Lucia Zamarano, Dr. Epstein's direct superior at Wayne State.

21. In addition to her verbal statements, on March 1, 2004, Dr. Miller sent an email to Dr. Chiocca and correspondence to Dr. Joshua Bederson ("Dr. Bederson") of Mount Sinai Medical Center and Dr. Daniel Giang ("Dr. Giang") of Loma Linda University, falsely accusing Dr. Epstein of misrepresenting she was the Director of ICU at Mt. Sinai and had resigned from Loma Linda.

22. On January 12, 2004, in accord with procedure granted to the male residents in the OSU neurosurgical program, Dr. Miller scheduled Dr. Epstein for 12 months off-service time, which would have given Dr. Epstein an appropriate amount of time for studying for the ABNS exam.

23. On March 15, 2004, Dr. Miller prematurely terminated Dr. Epstein's 12-month off-service rotation without implementing a plan to assess her progress or assist in her training and studies ostensibly on the grounds that her training in previous programs was incomplete and that the faculty of OSU doubted her technical expertise.

24. During the course of Dr. Epstein's residency Dr. Miller continually demonstrated a pattern of discrimination and harassment which cultivated a hostile work environment. During weekly conference meetings, Dr. Miller consistently ignored Dr. Epstein's correct answers to questions and would then restate the question to another male resident, to whom Dr. Miller would give credit for the same response given by Dr. Epstein. At Dr. Epstein's oral presentations Dr. Miller repeatedly spoke over her and allowed interruptions by the male residents including off topic remarks and personal phone calls, which were not allowed when the male residents made their presentations. Although Dr. Epstein complained to Dr. Miller and Dr. Chiocca about these incidents, Dr. Miller took no action and continued to foster the hostile environment.

25. Dr. Epstein was further targeted for reprimands that were not levied upon other OSU residents. On April 12, 2004, Dr. Epstein was advised by the Chief Resident, Dr. Eduardo Perez ("Dr. Perez") that anyone who arrived over half an hour late for work would be sent home and documented her tardiness in her file with an email to Dr. E. Antonio Chiocca ("Dr. Chiocca"). However, on numerous subsequent occasions, male residents were not disciplined nor reprimanded for arriving to work more the a half hour late. Similarly, Dr. Epstein was reprimanded on several occasions for taking personal time or sick time from work when the male OSU residents were not subject to reprimand for similar behaviour.

26. On April 23, 2004, Dr. Miller stated in an e-mail to Dr. Chiocca and Dr. John McGregor

    that "we are approaching the time when we have sufficient documentation." She also stated that documentation was needed for surgical techniques for all residents to demonstrate that "we are documenting all residents the same way." Dr. Miller additionally stated that "She [Dr. Epstein] is 40 years old, and this should not go on another year."

27. On May 1, 2004, Dr. Epstein complained to Dr. Chiocca, the Chair of the Neurosurgical Department, about Dr. Miller's conduct and behaviour towards her as well as that of Dr. Perez and instances of inappropriate sexual behaviour by male residents. Dr. Chiocca did not investigate Dr. Epstein's complaints nor took any corrective measures.

28. On May 11, 2004, after complaining about the excess number of hours Dr. Epstein was working, the number of calls she took each night, and the accuracy of her reporting of hours worked, Dr. Perez required Dr. Epstein to turn in her daily hours to either himself or Dr. Kiehm each day for approval, a requirement not made of the other OSU male residents despite similar issues with their working hours and disclosure that they were not accurately reporting their hours.

29. Dr. Perez also established a pattern of favoritism regarding assignment of surgical cases. Specifically, on April 14, 2004, April 28, 2004, and May 11, 2004, Dr. Epstein was refused OR time and relegated to clinical duties while surgical cases were assigned to Dr. Ogden and other male OSU residents. Although Dr. Epstein complained to Dr. Chiocca and Dr. Miller about the favoritism shown by Dr. Perez, no corrective measures were taken.

30 On June 1, 2004, Drs. Miller and Chiocca sent a letter dated May 28, 2004, to Dr. Epstein stating that she had been demoted to a PGY-3 resident based upon her ABNS exam scores, which had never been used previously to rate any male residents in the OSU program. To the contrary, despite a very low score on the ABNS exam, Dr. Ogden was promoted and additionally received a letter of recommendation from Dr. Miller.

31. On August 8, 2004, Dr. Epstein met with Dr. Andrew Thomas, Assistant Dean of Graduate Medical Education, regarding her demotion, the several incidents with Dr. Perez, and her inability to get sufficient OR experience and requested that she be provided assistance in dealing with the stress from the harassment and gender discrimination, however Dr. Thomas failed to take any corrective measures.

32. On October 15, 2004, Dr. Epstein received an e-mail from Dr. Miller complaining that she was not correctly reporting her hours and ordering her to begin reporting her hours directly to Dr. Kiehm, as she had been previously forced to do by Dr. Perez, despite the fact that the other male OSU residents were not required to report their hours to Dr. Kiehm.

33,        Through the remainder of 2004, Dr. Epstein was supervised by Dr. Perez, during which time she continued to receive disproportionately less OR time than OSU male residents and continued to be singled out and subject to continued instances of harassment by Dr. Perez and Dr. Kiehm.

34.        In addition to gender discriminatory practices and sexual harassment, the hostile work environment at OSU included ethnic and cultural prejudice evidenced by a statement in January, 2005, by Dr. Kiehm in front of Dr. Epstein, a Mexican-American, that, "We should not admit foreigners into our program."

35.        The targeted harassment of Dr. Epstein included Dr. Greg Balturshot ("Dr. Balturshot") a practice associate of Dr. Kiehm and Dr. Ogden at Riverside Hospital, who interfered with Dr. Epstein's interns, falsely accused her of mishandling cases, and changed orders she had given, causing Dr. Epstein to refuse to participate in his surgical cases and further contributing to the hostile work environment.

36.        During Dr. Epstein's review in January, 2005, based in part upon Dr. Balturshot's accusations, Dr. Miller stated that her knowledge was "not up to par" and that she must pass the next ABNS exam with a score of 200 or higher or she would be placed on probation, despite the fact that the "passing" grade on the ABNS exam changes from one year to another and that Dr. Epstein was a PGY 3 resident and the OSU policy only requires a resident to pass the ABNS exam prior to their PGY 6 year.

37.        The requirement that Dr. Epstein pass the ABNS exam early as a PGY-3 with a specific score of 200 or better or be placed on probation has never been made of any male OSU resident.

38.        In addition to the premature termination from her off-service rotation, affording only 2 months time to study for the ABNS exam, Dr. Epstein was routinely and systematically excluded from study groups authorized by Dr. Miller for the male OSU residents.

39.        During the course of her residency, Dr. Epstein was further singly excluded from social functions, dining events, golf outings, and football games, to which the other male OSU residents were invited as employment benefits.

40.        On February 14, 2005, Dr. Epstein was advised by Dr. Maria Santoyo-Stein ("Dr. Santoyo-Stein") a female, Jewish, Mexican Anesthesiologist that worked with Dr. Kiehm, that Dr. Kiehm had expressly admitted that he was being mean and abusive toward Dr. Epstein and that Dr. Miller was anti-Semitic and had previously actively sought to discredit Dr. David Yashon, a Jewish Neurosurgeon who practiced at Riverside Hospital.

41. On March 10, 2005, Dr. Philip Immesoete came into a room immediately after Dr. Epstein had presented a case, dropped his pants and underwear to his ankles and exposed his genitals and buttocks "mooning" Dr. Epstein and the other male residents and medical students in the room, eliciting inappropriate sexual comments from several of the male residents.

42. On the same afternoon following this incident on March 10, 2005, Dr. Epstein met with Kate Dillingham, Director of Human Resources for the OSU College of Medicine, and reported the continued instances of harassment and discrimination, including the incident earlier that day with Dr. Immesoete.

43. On March 31, 2005, Dr. Miller told the OSU residents that they could take the ABNS exam for credit, but that it would not count against them, directly contrary to what she had specifically required of Dr. Epstein one year earlier under the threat of placing her on probation.

44. On April 15, 2005, Dr. Epstein met with Dr. Janet Bay ("Dr. Bay"), Neurosurgery Residency Director at Riverside Hospital. Dr. Bay advised Dr. Epstein that there was an impression that she was not a team player, which she acknowledged was only one side of the story, but did not allow Dr. Epstein to offer any information to the contrary.

45. Shortly thereafter, in a meeting with a nurse practitioner who worked closely with Dr. Kiehm and who had complained about Dr. Epstein, Dr. Epstein was summarily reprimanded by Dr. Bay based solely upon the statements of the nurse practitioner and without allowing Dr. Epstein to offer any information or statements.

46. On May 18, 2005, Dr. Epstein was advised by Dr. Rebecca Brightman ("Dr. Brightman"), a practicing physician at Riverside Hospital, that even before her rotation began at Riverside, the staff at Riverside had heard many negative things about Dr. Epstein and that Dr. Kiehm was actively trying to harm her career, although Dr. Brightman stated she believed Dr. Epstein was very competent and capable.

47. On May 20, 2005, Dr. Epstein was advised by a nurse at Riverside Hospital that Dr. Kiehm was instructing the staff to gather any negative information they could against Dr. Epstein and that Dr. Kiehm and other residents had done the same thing to a previous female OSU neurosurgical resident, Dr. Robin Mitchell.

48. On May 24, 2005, Dr. Epstein was informed by Dr. Chiocca that she would be reviewed in the first week of June, 2005, and that if her performance did not improve she would be placed on probation for a period of three months and then terminated. Dr. Chiocca also advised Dr. Epstein that Dr. Miller would be making the final determination as to whether she would be terminated, despite the fact that Dr. Epstein had previously filed a harassment complaint against Dr. Miller.

49. The following day, on May 25, 2005, Dr. Epstein met with Dr. Thomas regarding the continued harassment and discrimination. Following their discussion, Dr. Thomas placed Dr. Epstein on paid leave based upon her complaint of a hostile work environment and requested she file a formal complaint with OSU Human Resources.

50. On June 6, 2005, Dr. Epstein met with Marjorie Hamlett in OSU Human Resources and filed a formal complaint against Dr. Miller, Dr. Chiocca, Dr. Kiehm, Dr. Perez, and Dr. Baltershot.

51. Shortly after meeting with Ms. Hamlett, Dr. Epstein received a letter from Dr. Thomas requiring her to return to work stating that Ms. Hamlett had determined Dr. Epstein's complaints were not sufficient reason to be on paid leave.

52. On June 13, 2005, Dr. Epstein returned to work at Riverside and requested off-service duties, which request was denied.

53. On June 29, 2005, Dr. Epstein received her review by Dr. Miller, who placed her on probation because of "lack of insight and knowledge" at Riverside, although Dr. Miller stated that Dr. Epstein's technical experience had improved.

54. On June 30, 2005, Dr. Epstein sent a formal request to Dr. Thomas that she be placed on unpaid leave until the issues of harassment and discrimination were resolved. Dr. Thomas denied the request without explanation and required Dr. Epstein to return to work on July 5, 2005, where she would work directly with Dr. Miller in surgeries and clinical duties.

55. As a result of what had become an impossible work environment for Dr. Epstein, coupled with the requirement that she return to work with Dr. Miller, Dr. Epstein developed physical symptoms including nausea, vomiting, diarrhea, severe abdominal pain, headaches, and lack of sleep, for which she sought medical treatment.

56. As a direct cause of the untenable and hostile work environment created by Dr. Miller, Dr. Kiehm, Dr. Chiocca, and Dr. Thomas, Dr. Epstein did not return to work at Riverside on July 5, 2005 and was constructively and wrongfully discharged from OSU Medical Center.

57. On July 7, 2005, Dr. Epstein, through legal counsel, filed a formal demand letter to OSU seeking redress for the harassment, discrimination, and wrongful constructive discharge from OSU Medical Center and sought to negotiate a resolution. During the time negotiations were taking place, OSU conducted an internal investigation through the Lane Leadership Group which found fault with Dr. Miller and Dr. Ogden.

58. After a one year unpaid leave of absence, a negotiated agreement was reached for Dr. Epstein's return to OSU Medical Center subject to several conditions, including that she submit to psychiatric testing, return at a PGY-3 level, still be on probation, and sign a letter acknowledging her probationary status. Dr. Epstein was assigned Dr. Mario Ammirati ("Dr. Ammirati") as her mentor and Dr. Chiocca as her program director with the express provision that neither Dr. Miller nor Dr. Ogden were to supervise Dr. Epstein.

59. Despite the terms of the agreement, Dr. Miller and other OSU male residents continued to demonstrate a pattern of harassment and discrimination. On the date Dr. Epstein was to return to OSU Hospital, Dr. Miller refused to accept a faxed copy of the signed letter of acknowledgment and ordered that Dr. Epstein be sent home and only allowed to return to work after she had personally signed the letter in front of another OSU staff member.

60. Subsequent to Dr. Epstein's return to OSU, Dr. Atom Sarkar ("Dr. Sarkar") repeatedly singled her out during weekly conferences and quizzed her until she made a mistake, following which he made derogatory comments about Dr. Epstein in front of other OSU residents and medical students.

61. After Dr. Epstein ceased working with him, Dr. Sarkar, acting under Dr. Miller's instructions for him to evaluate Dr. Epstein's knowledge base, continued to interfere with Dr. Epstein's patient care, including repeatedly paging Dr. Epstein to his office without reason taking her away from her patient care responsibilities and demanding that she leave assigned operative cases.

62. Dr. Miller herself continued to degrade and humiliate Dr. Epstein in front of other OSU residents by claiming that Dr. Epstein was the reason she could not reduce everyone else's work hours, recognizing that several residents had made significant academic accomplishments specifically excluding Dr. Epstein, even though she had exceeded those accomplishments herself, and insinuating that Dr. Epstein would not be continuing in the OSU neurosurgical program even prior to the disclosure of the ABNS exam results.

63. On December 7, 2006, Dr. Chiocca advised Dr. Epstein that there were still concerns about her "medical knowledge" and that, contrary to the terms of her reinstatement agreement, she would be required to pass the ABNS exam in March, 2007, rather than the following year as previously agreed, or she would be terminated from the program. Subsequently, Dr. Epstein was specifically excluded from study group sessions authorized by Dr. Miller.

64. Due to the extremely short period of time prior to the ABNS exam, Dr. Epstein was forced to take vacation time and unpaid leave in order to study. In addition, Dr. Epstein became ill and Dr. Miller refused to excuse any absence from work and made comments to Dr. Epstein in front of hospital staff that neurosurgeons work when they are sick.

65. Pursuant to the requirement of Dr. Chiocca, Dr. Epstein sat for the ABNS exam on March 31, 2007, along with 2 junior OSU residents. Despite Dr. Epstein's request to seal the exam results, the results were sent unsealed to Dr. Miller's office.

66. On April 1, 2007, Dr. Epstein returned to full-time employment as an OSU resident and received positive reviews from Dr. Ammirati regarding her performance.

67. Upon receiving the results of the ABNS exam, Dr. Chiocca met with Dr. Epstein and advised her that she had failed, although the two junior residents had both passed the exam. Dr. Chiocca did not provide any further information regarding the exam or exam results and refused to advise Dr. Epstein of any consequences.

68. On or about May 24, 2007, while Dr. Epstein and Dr. Ammirati were attending a conference in Chicago, Ill., the OSU Neurosurgery Education Committee met in their absence and terminated Dr. Epstein from the OSU program. Upon Dr. Epstein's return to OSU, she was presented with a letter of termination by Dr. Chiocca, who refused to discuss any of the details, and was dismissed from the OSU Neurosurgical Residency Program effective May 30, 2007.

69. On July 27, 2007, upon the meeting of the OSU GME Appeal Hearing Committee, Dr. Epstein submitted her written request that her termination be rescinded and that she be allowed to complete the OSU Neurosurgical Residency Program, which was denied. The Committee met again on August 2, 2007 to discuss Dr. Epstein's case.

70. In a letter of August 14, 2007, Dr. Thomas advised Dr. Epstein that the Appeal Hearing Committee had upheld the disciplinary action taken by the OSU Neurosurgery Education Committee dismissing her from the OSU Neurosurgery Residency Program and had therefore denied her appeal.

71. Subsequent to her termination, Dr. Epstein has applied for employment at several other institutions and has received enthusiastic interest initially. However, in each of these cases, the employers suddenly and without explanation terminated negotiations with Dr. Epstein and did not make an offer of employment.

72. Upon information and belief, the termination of Dr. Epstein's potential employment positions occurred after the potential employers had contacted OSU College of Medicine and/or Medical Center staff and were the direct result of misrepresentations and false information submitted to the employers by OSU Medical Center administration and staff.

73. Subsequent to Dr. Epstein's termination, OSU administration and staff have engaged in a

      malicious pattern of slander against Dr. Epstein targeted at her potential employers with the intent to discredit Dr. Epstein and prevent her from pursuing her career goals as a neurosurgeon.

74. On June 16, 2008, Dr. Epstein was notified by the Colorado Board of Medical Examiners that an anonymous party had alleged that she was falsely representing herself as a board certified neurosurgeon residing in the State of Colorado. The Board conducted an investigation and on March 24, 2009, determined that the allegations were unfounded and dismissed any further administrative action against Dr. Epstein. Upon information and belief the anonymous party was affiliated with the OSU Medical Center staff.

75. Upon information and belief, on April 23, 2009, during the course of Dr. Epstein's credentialing process in Colorado, Dr. Thomas was contacted by R.T.Welter and Associates, Inc. as part of a background investigation. Dr. Thomas made false and slanderous remarks regarding Dr. Epstein and represented to R.T.Welter and Associates, Inc. that Dr. Epstein was not a neurosurgeon, should not be using the title of neurosurgeon, and that her license to practice medicine was restricted.

76. Upon information and belief, Dr. Thomas and/or other staff members at OSU further falsely represented to the Colorado Board of Medical Examiners that Dr. Epstein was not board certified and did not specialize in neurosurgery. In fact, Dr. Epstein was certified by the American Board of Clinical Neurological Surgery on March 28, 2008.

77. Dr. Epstein on numerous occasions has requested that OSU provide her with a Certificate of Training confirming the 36 months of training she received at OSU. To date, OSU has failed and refused to provide Dr. Epstein with a Certificate of Training, resulting in loss of employment and career opportunities.

## FIRST CLAIM FOR RELIEF
**(Discrimination and Disparate Treatment – Title VII**
**Against All Defendants**)

78. Dr. Epstein hereby incorporates paragraphs 1 through 77 of this Complaint as if set forth fully herein.

79. OSU by and through its Medical Center and affiliates was Dr. Epstein's employer.

80. The actions and inactions of OSU through Dr. Miller, Dr. Thomas, and

affiliated staff of its Medical Center and College of Medicine with regard to Dr. Epstein's complaints of disparate treatment and unequal pay on the basis of her Gender, Religion, National Origin and Age violate Title VII of the Civil Rights Act, 42 U.S.C. §2000e et. seq.

81. The conduct of Dr. Miller, Dr. Thomas, and the affiliated staff of OSU Medical Center and College of Medicine constitutes discrimination on the basis of Dr. Epstein's Gender, Religion, National Origin and Age for which OSU is vicariously liable.

82. The Defendants' statutory violations have caused and continue to cause Dr. Epstein to suffer damages.

**SECOND CLAIM FOR RELIEF**
**(Sexual Harassment – Title VII**
**Against Defendants Ohio State University and Dr. John Ogden**)

83. Dr. Epstein hereby incorporates paragraphs 1 through 82 of this Complaint as if set forth fully herein.

84. The actions and inactions of OSU and Dr. John Ogden with regard to Dr. Epstein's complaints of sexual harassment violate Title VII of the Civil Rights Act, 42 U.S.C. §1983 et. seq,

85. The conduct of Dr. Ogden and the affiliated staff of OSU Medical Center and College of Medicine constitutes sexual harassment in violation of Title VII of the Civil Rights Act, 42 U.S.C. §1983 et. seq. for which Dr. Ogden is individually liable and OSU is vicariously liable.

86. The Defendants' statutory violations have caused and continue to cause Dr. Epstein to suffer damages.

**THIRD CLAIM FOR RELIEF**
**(Wrongful Termination - Hostile Work Environment  - Title VII**
**Against all Defendants)**

87. Dr. Epstein hereby incorporates paragraphs 1 through 86 of this Complaint as if set forth fully herein.

88. The actions, statements, conduct, and discriminatory behaviour of the Defendants in violation of 42 U.S.C. §2000e created a hostile work environment such that Dr. Epstein was unable to perform the duties and obligations and responsibilities of her employment.

89. As a direct and proximate cause of the hostile work environment created by Defendants, Dr. Epstein was constructively and wrongfully terminated from her employment, in violation of 42 U.S.C. 2000e, et seq.

90. The Defendants' statutory violations have caused and continue to cause Dr. Epstein to suffer damages.

### FOURTH CLAIM FOR RELIEF
### (Retaliation – Title VII
### Against All Defendants)

91. Dr. Epstein hereby incorporates paragraphs 1 through 90 of this Complaint as if set forth fully herein.

92. The actions and inactions of Ohio State University through Dr. Miller, Dr. Thomas, and affiliated staff of its College of Medicine by disparaging Dr. Epstein to future employers and providing false and/or misleading information to the Colorado Board of Medical Examiners constitutes retaliation in response to Dr. Epstein's previous complaints of harassment and discrimination and violate Title VII of the Civil Rights Act, 42 U.S.C. §2000e et. seq.

93. Dr. Miller's placement of Dr. Epstein on probation and recommendation of preclusion of Dr. Epstein from the OSU neurosurgical residency program constitutes retaliation in response to Dr. Epstein's previous complaints of harassment and discrimination and violate Title VII of the Civil Rights Act, 42 U.S.C. §2000e et. seq..

94 Dr. Thomas' statements to employees of R.T. Welter constitutes retaliation in response to Dr. Epstein's previous complaints of harassment and discrimination and violate Title VII of the Civil Rights Act, 42 U.S.C. §2000e et. seq.

95. The Defendants' statutory violations have caused and continue to cause Dr. Epstein to suffer damages.

### FIFTH CLAIM FOR RELIEF
### (Wrongful Discharge - Constructive Termination - Tort Claim)
### Defendants Ohio State University and Affiliates

96. Dr. Epstein hereby incorporates paragraphs 1 through 95 of this Complaint as if set forth fully herein.

97. Ohio State University through its College of Medicine was Dr. Epstein's employer and is subject to the anti-discrimination law.

98. The actions and inactions of Ohio State University through Dr. Miller, Dr. Thomas, and affiliated staff of its College of Medicine created and fostered an intolerable work environment resulting in Dr. Epstein's physical illness and inability to continue in the OSU neurological residency program and thereby constituted wrongful discharge of Dr. Epstein through constructive termination of her employment therein.

99. Dr. Miller's conduct constitutes aiding and abetting discrimination on the basis of Dr. Epstein's gender, religion, national origin and age for which she is subject to personal liability.

100. As a direct and proximate cause of Defendants' conduct, Dr. Epstein has and continues to suffer damages and losses.

## SIXTH CLAIM FOR RELIEF
### (Slander - Tort Claim
### Against Dr. Miller and Dr. Thomas)

101. Dr. Epstein hereby incorporates paragraphs 1 through 100 of this Complaint as if set forth fully herein.

102. Dr. Miller and Dr. Thomas made false statements concerning Dr. Epstein to third persons and those statements damaged Dr. Epstein's reputation in the community and prejudiced Dr. Epstein's professional reputation.

103. Dr. Miller's conduct has caused and will continue to cause Dr. Epstein to suffer damages.

## SEVENTH CLAIM FOR RELIEF
### (Intentional Interference with Advantageous Relations - Tort Claim
### Against all Defendants except Dr. Ogden)

104. Dr. Epstein hereby incorporates paragraphs 1 through 103 of this Complaint as if set forth fully herein.

105. Dr. Miller was aware of Dr. Epstein's employment relationship with OSU Hospital and intentionally interfered with that relationship for an improper purpose and by improper means, including but not limited to presenting Dr. Epstein for peer review in an unfavorable light in bad faith and with malice..

106. Dr. Miller's malice and bad faith void any conditional privilege applicable to supervisors in an employment relationship, and void the privilege afforded to peer review communications.

107. Dr.Thomas' statements to R.J. Welter and Associates were made with the intent to prevent Dr. Epstein from further taking advantage of future career opportunities by disparaging and discrediting her credentialing process as a physician.

108. The statements and misrepresentations made by OSU Medical Center and/or College of Medicine staff to third parties who were interviewing Dr. Epstein for potential employment were made with the intent to discredit Dr. Epstein and prevent her from obtaining employment.

109. The conduct of Dr. Miller, Dr. Thomas and the OSU Medical Center staff has caused and continues to case Dr. Epstein to suffer damages.

## EIGHTH CLAIM FOR RELIEF
### (Outrageous Conduct - Tort Claim - Dr. Miller and Dr. Thomas)

110. Dr. Epstein hereby incorporates paragraphs 1 through 109 of this Complaint as if set forth fully herein.

111. The statements and conduct of Dr. Miller and Dr. Thomas constitutes extreme and outrageous conduct.

112. Dr. Miller and Dr. Thomas made the alleged statements and engaged in the alleged conduct recklessly or with the intent of causing Dr. Epstein severe emotional distress.

113. As a direct and proximate result of Defendants' Miller and Thomas extreme and outrageous conduct, Dr. Epstein suffered injuries, damages and losses.

## NINTH CLAIM FOR RELIEF
### (Negligent Infliction of Emotional Distress - Tort Claim Dr. Miller and Dr. Thomas)

114. Dr. Epstein hereby incorporates paragraphs 1 through 113 of this Complaint as if set forth fully herein

115. The false, defamatory statements and discriminatory conduct of Dr. Miller and Dr. Thomas were made negligently and without due regard for the well-being of Dr. Epstein.

116. The false, defamatory statements and discriminatory conduct of Dr. Miller and Dr. Thomas caused Dr. Epstein to suffer continuing physical illness and severe emotional distress.

117. As a direct and proximate cause of Defendants' Miller and Thomas negligence, Dr. Epstein has and continues to suffer injuries, damages, and losses.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in her favor and against Defendants, jointly and severally, for her economic and non-economic compensatory damages, pre- and post-judgment interest, penalties, attorney's fees, costs, and such other and further relief as the Court deems proper and just.

**JURY TRIAL DEMANDED.**

Respectfully submitted this  9th  day of June, 2010.


                CAMERON W. TYLER and ASSOCIATES, P.C.


                By: s/ Bruce W. Sarbaugh
                    Cameron W. Tyler, Esq., (#18201)
                    Bruce W. Sarbaugh, Esq., (#16185)
                    Maria G. Berrones, (#37310)
                    Cameron W. Tyler and Associates, P.C.
                    3223 Arapahoe Avenue, Suite 30
                    Boulder, CO 80303
                    Phone No.: (303) 443-2644
                    Fax No.:    (303) 545-6979
                    e-mail: law@camtylerlaw.com